## CUMBERLAND GLASS MANUFACTURING COMPANY

*v.*

## THE GLASS BOTTLE BLOWERS' ASSOCIATION OF THE UNITED STATES AND CANADA, DENNIS A. HAYES et al.

[Filed December 14th, 1899.]

1. Under *Pamph. L. 1883 p. 36*, making it lawful for workmen to combine to persuade any person or persons, by peaceable means, to enter into a combination for entering or leaving the employment of any person or corporation, the mere stationing of striking workmen to watch the employer's premises for the purpose of seeing who can be made the subject of peaceable persuasion to strike is not of itself sufficient to warrant a preliminary injunction, unless it appears that the purpose of the guard is also to coerce actual or prospective employes by non-peaceable means to quit work.

2. The court of chancery has jurisdiction to enjoin a continuing trespass or injury to property, though such trespass or injury may also involve a crime.

3. Where more or less continuous acts of violence are indulged in by striking workmen, consisting in the assembling of crowds at the employer's premises, in the streets and at the railroad station, which occasionally attack property, use abusive language towards employes, forcibly interfere with persons seeking to enter the premises, and forcibly intercept the employer's incoming workmen at the railroad station, such acts and conduct furnish grounds for an injunction restraining those participating from so interfering with engaged workmen, notwithstanding instructions to strikers to use only peaceable methods in persuading others to quit work.

4. Neither a workmen's association, conducting and financially supporting a strike by its members, nor the president of such association, who organizes and directs such strike, confers with its leaders, disburses the financial aid to strikers, and promises it to others on their striking, will be enjoined at suit of the employer to restrain interference with engaged employes, neither having authorized, encouraged, known of, nor tacitly approved any acts of violence.

The bill of the complainant sets out that it is a manufacturer of both window glass and hollow ware; that on March 16th, 1899, it received a letter from Dennis A. Hayes, president of the Glass Bottle Blowers' Association of the United States and

Canada, stating that the non-union glass blowers of South Jersey had organized and agreed that they should ask their employers to concede them such wages and privileges as had been agreed upon between the union manufacturers and their employes.

The letter requested a meeting to discuss this matter. Those manufacturers who had received copies of this letter met and appointed a committee to confer with Mr. Hayes. This committee being unable to come to an agreement with Hayes, suggested the appointment of an arbitration committee, to which suggestion Mr. Hayes refused to accede, and declined to consider any proposition which did not include an increase of wages and a reduction in the number of future apprentices, and the subjection of all manufacturers to the domination of the defendant association. They thus failed to agree, and on April 8th, 1899, all the journeymen blowers and finishers, with two exceptions, in the hollow ware department of complainant's works left their work while the molten glass was in the furnace and tanks, and this branch of work has since been idle.

The bill further states that Hayes lives in Philadelphia, but came to Bridgeton and directed the strike either personally or through orders issued by him to William M. Doughty, Charles Doughty and George W. Branin, none of whom are residents of Bridgeton, but who, since the strike, have been continuously in said city conducting it; that Mr. Hayes, William Lanning, secretary; Conrad Auth, its treasurer, and William Doughty and George W. Branin, members of the executive committee of the Glass Bottle Blowers' Association, have furnished sums of money to prevent the workers from returning to their work; that two branches of said association, namely, No. 8 and No. 19, have been organized in Bridgeton to assist in disbursing said sums; that certain persons acting by advice of said association have congregated in large numbers, some armed with clubs, about the approaches to complainant's factory, and by threats and force have coerced and intimidated such workmen as have offered their services to complainant; that they not only guarded such approaches, but guarded all railroad stations to prevent,

by violence, all who offered their services to complainant; that complainant has been compelled to lodge thirty of its employes within their works, to protect them from injury, and that the strikers have attacked and maltreated those about to enter complainant's works.

The answer admits the writing of the letter by Hayes, but states that the non-union workmen requested him to do so. It denies that the proposition for an arbitration committee was actually made by the committee of manufacturers, but states that Hayes agreed to a meeting of the counsel of the manufacturers and of the association if the former would agree to continue their artisans at work uninterruptedly and would agree to abide by the terms for the next fire as they should be fixed at the ensuing July conference between the manufacturers' association and the defending Glass Bottle Blowers' Association, and that this proposition was repudiated by the complainant; that the workmen voluntarily left work upon this refusal and joined the Glass Bottle Blowers' Association.

The answer admits that workmen who ceased labor for this reason are entitled to a stated sum per week. It admits the organization of branches No. 8 and No. 19 at the request of the workmen. It admits that they, without violence, have sought to persuade each artisan to join their association, but denies the commission of any act of violence.

The affidavits attached to complainant's bill are, in substance, to the following effect:

[Here follows substance of affidavits.]

That from the inception of the strike the street in front of the entrance of the works of complainant has been constantly occupied by bands of strikers—some armed with clubs—and that they used indecent and threatening language to the workmen of complainant, and that they interposed physically between the entrance and anyone wishing to enter or were suspected to be a prospective employe; that they threw bricks and stones against the house and fence of the company and into the house of one who lodged the workmen of the company; that employes and those suspected of seeking work were held up

and insulted and threatened on the street and in the city cars; that the platform of the railroad stations, on each arrival of a train, was crowded with strikers, and workmen were sought out and physically pushed into the headquarters of the strikers, where they were half persuaded and half coerced into abandoning their intention of working in complainant's factory; that incoming trains with workmen on board were bombarded with stones, and the persons in charge of these workmen were struck and seriously injured.

The manner in which the several defendants named in the bill were connected with the transactions thus detailed will appear by the further proofs contained in the affidavit of the complainant, and how far the force of the testimony of complainant's witnesses is modified by the affidavits of the defendants will appear by a statement of the substance of the latter affidavits attached to the answer.

[After stating the substance of these affidavits at length the court proceeds.]

*Mr. Walter H. Bacon*, for the complainant.

*Mr. John W. Wescott* and *Mr. John J. Crandall*, for the defendants.

REED, V. C.

Before drawing my conclusions as to the facts proved by these affidavits, I will state the general doctrine, as I understand it, which controls the liability of the defendants to an injunction.

Every employer has the right to engage, or refuse to engage, whomsoever he chooses, just as every workman has the right to enter, or refuse to enter, the service of any employer as he may choose. Apart from obligations arising from special contract for employment, or for services, for a specified period of time, every employer has the right to discharge a workman, and every workman has the privilege of leaving the service of his employer, at his pleasure. The freedom of the individual workman to seek employment, and of the individual master to give or refuse

Cumberland Glass Mfg. Co. v. Glass Bottle Blowers' Ass'n.

employment, belongs to every citizen. Formerly a concerted act, by which a number of workmen combined to leave a master's employment simultaneously, or to persuade other workmen to leave his employment together, for the purpose of injuring his business, or of compelling him to concede increased wages, or to hire or discharge particular workmen, was an indictable conspiracy. It was, however, held, in the case of *Mayer v. Journeymen Stone Cutters' Association, 2 Dick. Ch. Rep. 519,* that since the passage of the act of 1883, page 36, a combination, which before that time would have been held to be a conspiracy, became by the force of this statute a lawful combination. This act has not been repealed. By its terms it is lawful for workmen to combine to persuade, by peaceable means, any person or persons to enter into any combination for the leaving or entering into the employment of any person or persons or corporation.

The purpose of the act was undoubtedly to legalize strikes, *i. e.,* the organization of concerted simultaneous cessation of work by bodies of workmen.

The words employed by the statute cover a combination for the purpose of persuading others to combine for the purpose of entering or leaving an employment. The words would seem to intend a legalization of a combination to induce others to join in a strike, and are perhaps broad enough to legalize a combination to persuade individual workmen to quit or refuse to enter the service of any person or persons or corporation.

According to the act the means adopted must be peaceable, as the words " persuade, advise or encourage " indicate, without the use of the words " by peaceable means." Therefore, the methods adopted to induce a workman to quit or to refuse to enter an employment, must be persuasive and not coercive.

It is entirely settled that the moment that individuals either singly or in company, for the purpose of compelling a master to accede to their views, use force or threats of force, or in any way injure or threaten to injure either the master, or those working or wishing to work for him, the act becomes illegal. Interference with the movement of employes, in passing in and out of their employer's factory, or the use of abusive language upon

the street or elsewhere, towards such employes, indeed any conduct which is calculated to induce those working or wishing to work, against their wish, to abandon their work or their intention to seek work, are within the limits of coercive conduct. There is no contrariety of judicial view in respect to the illegality in the use of any act which is calculated to coerce, but in respect to what acts are to be regarded as coercive, there is naturally more difference in judicial sentiment. It finds expression mainly upon the fact of " picketing "—that is, by relays of guards in front of a factory or the place of business of the employer, for the purpose of watching who should enter or leave the same.

In *Sherry* v. *Perkins, 147 Mass. 212,* the workmen hired a boy to carry a banner in front of complainant's factory, upon which was inscribed, " Lasters are requested to keep away from P. P. Sherry's. Per order L. P. U." The complainant would not pay the wages as fixed by the Lasters' Protective Union. An injunction went because this conduct injured complainant's business by intimidating workmen, so as to deter them from keeping or making engagements with the plaintiff.

In *Vegelahn* . v. *Guntner, 167 Mass. 92,* the workmen placed two men in front of complainant's place of business, who were changed every hour from half-past six o'clock in the morning to half-past five o'clock in the afternoon. An injunction went by the judgment of a divided court, the majority seeming to hold that the " picketing " itself was unlawful, although the injunction as actually drafted was against picketing for the purpose of preventing any person or persons who may be now or hereafter in his employ, or desirous of entering it, from entering it or continuing in the same.

In *Beck et al.* v. *Railway Teamsters' Protective Union, 42 L. R. An. 407 (1899),* it was held that a " picketing " of the premises of a person boycotted, in order to intercept its teamsters or to prevent persons going there to trade, is unlawful. In that case members of the union followed complainants' teamsters along the street, halloaing at them and using abusive language,

and intercepting upon the street those who were going to the mill with their teams. An injunction was ordered.

In *American Steel and Wire Co.* v. *Wire Drawers', &c., Union, 90 Fed. Rep. 608,* Mr. Justice Hammond regarded the use of the streets in front of the factory by a large number of strikers as in itself an unlawful occupation of the streets and calculated to intimidate those working or passing into the works.

The same view seems to have been taken by Mr. Justice Goff in *Mackall* v. *Ratchford et al., 82 Fed. Rep. 41,* who enjoins the marching or countermarching of strikers in the street in front of complainants' place of business.

It is reported in *Case and Comment* of August, 1899, that in the case of *Winslow Brothers' Co.* v. *Building Trades Council,* Mr. Justice Holdron, of Chicago, refused an injunction against "picketing." It was against, in the words of the judge, "that picketing which is simply the active watch by workmen belonging to those lodges, or associations, or unions, of others so that they may know what is going on and what is done." Yet it is said that the judge cited with approval the case of *Beck et al.* v. *Railroad Teamsters' Protective Union, supra,* and *Vegelahn* v. *Gunther, supra,* in which case, as we have seen, the court seemed to hold that the picketing was in itself an intimidation. Looking at the form of the injunction in the latter case, in connection with the views expressed in the opinion, and in the absence of any case in the courts of this state, I cannot say that the law is so settled that a preliminary injunction can go upon the notion that picketing, without some other act evidential of coercion, is in itself evidence of intimidation. The decision of the question, I think, must depend upon the circumstances surrounding each case. There must be taken into account the size of the guard, the extent of their occupation of the street, and what they say and do. Taking every circumstance into account, if it appears that the purpose of the picketing is to interfere with those passing into or out of the works, or those wishing to pass into the works, by other than persuasive means, it is illegal. If the design of the picketing is to see who can be the subject of persuasive inducements, such picketing is legal.

Before turning again to the testimony, I will mention a point made by the defence regarding the equitable grounds upon which the bill is filed.

The defence insists that the bill sets out a series of trespasses or crimes, and that this court is asked to enjoin the commission of further similar trespasses or crimes.

The jurisdiction of the court of chancery to enjoin a continuing trespass or injury to property, although it may involve a crime, is entirely settled. The court ignores the crime and protects the complainant's property or business from civil injury. The jurisdiction of a court of equity to restrain acts like these charged in the bill, is entirely established. *Barr* v. *Essex Trades Union, 8 Dick. Ch. Rep. 101; In re Debs, 158 U. S. 564; Cœur D'Alene Consolidated Mining Co.* v. *Miners' Union, 51 Fed. Rep. 260; Vegelahn* v. *Gunther, supra,* and cases cited.

It remains to draw conclusions in respect to the facts proved, as applicable to the doctrine thus stated.

It will be perceived from an analysis of the testimony that the general condition of affairs, as detailed by the complainant's witnesses, is not materially changed by the answering affidavits. It is true that each one of the defendants denies, with more or less explicitness, that he was concerned in the specific acts charged against him. The fact, however, that there was disorderly and unlawful conduct on the part of very many of those engaged in the strike, is not refuted. There is no doubt that on April 13th, there was practically a riot at the railway station on the arrival of thirteen workmen; that on May 7th there was a riot at the station on the arrival of four new workmen; that on May 10th the same thing occurred on the arrival of four more workmen, on which occasion the switch on the railway spur leading into complainant's yards was spiked, and the boarding-house, wherein a number of employes of complainant were lodged, was bombarded with bricks and stones; that on May 13th the wagon of complainant was mobbed; that on May 18th Harry Nichtol was grabbed by five men as he stepped from the train, who thought him a prospective employe; that on May 25th, Davis, the complainant's team driver, had his wagon

stopped, and when he came to where there was a lot of strikers, he was hit on the head with a brick; that on June 7th and 10th there was disorder at the station on the arrival of four men, two of whom were dragged and pushed out of the station, and on July 10th the wagon of complainant, which had gone to the station for another workman, was attacked.

On July 9th Harry Hessert came to complainant's works with his brother and was detained by those who were engaged in the strike.

On July 13th a train with twelve workmen was attacked; the windows of the train were broken with stones; King was seriously injured and the workmen were pushed up into the headquarters of the strikers; that on July 24th John Brown's boys were taken to the strikers' headquarters, into which the father, with an officer seeking them, was refused admittance; on July 14th Lee, after being stopped by those engaged in the strike, finally got into the works of complainant and was told that he would not be there next week, for they would come and clean out the place.

There are other instances stated without dates.

It is entirely clear that almost continuously large bodies of men were in the street, in front of and around the factory of the complainant, and that large bodies of men attended the arrival of each incoming train.

Now, the force of the testimony is that while the directions to the guards and strikers in general may have been to employ only persuasive methods to induce workmen to quit the service of complainant or to refrain from entering into its service, coercive measures were in fact resorted to. It is not surprising that this should be so. When large bodies of men are combined to bring about a purpose, in the accomplishment of which their feelings and passions are involved, the line which separates argument from force is not readily recognized, or if recognized, not easily observed. Nevertheless, each man is bound to observe the right of the employe and employer to employ or seek employment undeterred by coercive influences. Now, it goes without saying that the bombardment of complainant's fences

and the boarding-house, the attack upon incoming trains carrying employes and the physical interference with or interception of workmen were illegal acts. So, too, I think, was the gathering of large crowds of workmen about the railroad station to assist in the interception of workmen. The actual outcome of such a crowd was seen at each arrival. The newcomers were surrounded and jostled and pushed along until they were landed in the headquarters of the strikers. It is almost a physical impossibility for the workmen to move otherwise than according to the will of the crowd, however much they may wish to do so. In respect to the crowd guarding the works, the question is whether it can be regarded as merely picketing for the purpose of seeing what was going on or whether it was there for the purpose of exercising a coercive power upon those who came to work or those already working for the complainant.

Taking the testimony so far as it stands substantially uncontradicted, I conclude that the crowds spoken of in the complainant's affidavits as "guards," judged by their size and acts, were designed for coercive as well as persuasive purposes. Conceding that a number of strikers could remain in the vicinity of the factory yard to see what was going on, yet when the number became a crowd, and when the acts of the crowd expanded into occasional attacks upon property, and abusive language towards employes, and interference with those seeking to enter the yard, the "guard" became a coercive instrument. A permanent guard in a public street, in front of citizens' houses or factories, is in itself a nuisance.

But it remains to consider how the testimony stands in respect to the participation of the several defendants in any of the acts above set out. I think that the affidavits of Cramer, Garrison, Gilliland, Hamilton, Carl, Marks, Mayhew, Clark, Samuel T. Moore, Nelson, Redfield, Schafer and Swain are such as to relieve them from liability to restraint under this rule.

In respect to Mr. Hayes, I have come to the same conclusion. He undoubtedly had the right to aid in the organization of the strike, to confer with the leaders of the strike, to direct the payment of funds to those who struck or promised it to those who

would strike.   He denies that he said that he would not mix with the men at headquarters for fear that if there should be any violence the authorities would put him to trouble.   Upon the face of the affidavits it does not appear that Hayes encouraged any violence or that he knew of any violence which he tacitly or expressly approved.   Nor do I see how the Glass Bottle Blowers' Association can be enjoined for the same reason.

I am of opinion, however, that there should be an injunction against Branin, Quick, Surien and Wilkens, who were on guard at the works or boarding-house, and against Hill and Henry, who also were at the railroad station ; against Charles and William M. Doughty, Gamble and Thoburn, who were in the crowds at the railway station, and the former of whom took Hessert to headquarters ; against McQuigg, who took the Brown boys to headquarters, and against Flagg, who took the Hessert brothers to headquarters and kept them there, and against Sourder, who does not deny that he stopped an employe from going into the mill.

I will settle the form of the decree upon notice.