IN THE

# SUPREME COURT

OF

# OREGON.

Argued March 2?, reargued July 16, affirmed October 1, 1920, re-
hearing denied January 25, 1921.

## HEITKEMPER v. CENTRAL LABOR COUNCIL.

(192 Pac. 765.)

**Torts—Statute Does not Legalize Picketing Merely to Procure Rec-
ognition of Union.**

1. Laws of 1919, page 614, declaring labor unions to be lawful
organizations, etc., does not embrace or legalize picketing an em-
ployer's place of business, and destroying his patronage, where the
only question involved is the recognition of the union.

**Conspiracy—Calling of Strike Held to Constitute "Conspiracy."**

2. Where a local union of jewelry workers, on failure of em-
ployers to reply to a circular relative to recognition of the union,
met and called a strike, notifying the central labor council, which
placed the employers on the unfair list, and pickets were at once
stationed about the places of business of two, there was a "con-
spiracy," a combination of two or more persons by concerted action
to do an unlawful thing or a lawful thing in an unlawful manner.

**Injunction—Damages from Picketing not Damnum Absque Injuria
Preventing Remedy.**

3. Damages to jewelers from picketing, pursuant to strike called
purely to enforce recognition of local union of jewelry workers, and
concurred in by central labor council, in view of the facts and the
motive of the strikers, *held* not *damnum absque injuria*, for which
the employers would not have any right of action for injunction or
otherwise.

---

For authorities discussing the question of controversy over open or
closed shop as justification for means employed to aid strike, see
notes in 17 L. R. A. (N. S.) 162; 35 L. R. A. (N. S.) 787; L. R. A.
1917F, 760.

On law as to picketing, see notes in 103 Am. St. Rep. 496; 13 Ann.
Cas. 60; Ann. Cas. 1918E, 54; 4 L. R. A. (N. S.) 302; 50 L. R. A.
(N. S.) 412.

99 Or.—1　　　　　　　(1)

From Multnomah:
WILLIAM N. GATENS,
JOHN P. KAVANAUGH and } Judges.
GEORGE W. STAPLETON,

In Banc.

The plaintiffs are different corporations and firms engaged in selling and engraving jewelry, repairing watches and clocks, and setting and cutting stones and agates, at their respective places of business in the City of Portland. The defendant Local Union No. 41 of the International Jewelry Workers' Union was and is an organized but unincorporated association of individuals, commonly called a laborers' union, having its constitution, rules and regulations by and through which all of the members thereof act as an organized body, with officers, including a president and secretary.

The complaint alleges that the defendant Edward Becker at the times mentioned was, and now is, president of the said union, and the defendant Sutliff was and is its secretary; that the members and officers of the said union have the vocation of watch and clock makers, engravers, jewelers, polishers, stone setters and cutters, and agate workers, operating and being hired as such by employers engaged in the same class of business as are the plaintiffs; and that some of the members of the union were employed by each of the plaintiffs prior to July 28, 1919.

It is averred that the defendant Central Labor Council is a body of delegates appointed by and representing different labor unions and organizations, including the defendant Local Union No. 41, with authority from the several unions, including the defendant, to decide for, order, and direct them and

their members in their respective conduct and actions; that the defendant Anderson is the president of the Central Labor Council, and that the defendant William Kinsey is vice-president and E. J. Stack is secretary thereof.

The plaintiffs charge that the jewelers' union, its officers and members, and the Central Labor Council, its officers and members, prior to July 28, 1919, formed a plan or federation with the object and purpose of injuring and destroying the business of the plaintiffs by preventing their respective customers from entering their different places of business and buying merchandise from them or having repairs made, and together conspired "to intimidate and annoy the said customers about to enter into the said places of business, by means of pickets to stand in front of and near the plaintiffs' said places of business on the sidewalk and in the streets, wearing banners or scarfs conspicuously displayed on their person, inscribed with words in effect, 'Unfair to Organized Labor,' and to address said customers personally, warning and advising them not to patronize the said plaintiffs on the ground to be stated by them that the plaintiffs were not fair to organized labor and to use insulting and opprobrious language to said customers, and to apply vituperative epithets to said plaintiffs and each of them." It is alleged that pursuant to such conspiracy, and with the unlawful intent to injure the plaintiffs in their business, to deprive them of their customers, to prevent them from selling their merchandise, and to cause each of them great loss of trade and profits, the defendants and other members of the said unions and of the said Central Labor Council of the City of Portland, did on divers and sundry days in the months of July and

August, 1919, cause the said pickets to stand in front of and near the place of business of the plaintiffs, Felix Bloch and F. Friedlander Company, wearing such inscribed banners, caused the pickets to address people desiring to enter the places of business of the two said plaintiffs to make purchases, and caused and directed them to advise, counsel, and demand that said customers should not patronize these plaintiffs for the reason that they were unfair to the defendants and to union labor, meaning the members of the respective organizations; that by direction thereof and pursuant to such conspiracy the pickets from time to time addressed intending customers entering plaintiffs' places of business, calling them "scabs," and asserting that they would be robbed; that by reason thereof many customers were intimidated and influenced not to enter such places and not to purchase anything from the plaintiffs; that the trade of the plaintiffs was materially reduced, to their irreparable loss and damage; that such picketing was conducted and continued during the business hours of each day, and that it still continues. The complaint further alleges that the defendants and the members of the union and of the conspiracy intend to, and, unless restrained, will, continue the picketing of plaintiffs' business, and prevent intending purchasers in large numbers from patronizing the plaintiffs, to their irreparable loss and damage; that—

"It is the object and purpose of the said conspiracy and the defendants to threaten to injure and destroy the business of the other plaintiffs in the same manner, and, by picketing their said places of business in the same manner and unless restrained, will begin to picket the places of business of the other plaintiffs and continue to do so as aforesaid";

—and that:

"The defendants are insolvent, and not able to respond to damages as aforesaid; that plaintiffs have no plain, speedy, or adequate remedy at law."

The plaintiffs pray for an injunction restraining the defendants from picketing the plaintiffs' places of business upon the street or sidewalk at or near such places of business; from displaying any banner inscribed "Unfair to Organized Labor," or words of similar import; from addressing said plaintiffs' customers or other people, attempting to influence or intimidate them, to dissuade them from entering such places of business, and from carrying out any other means of accomplishing the conspiracy.

For answer the defendants deny all of the material averments of the complaint, and for a further and separate defense allege that for about two months there had been a trade dispute and controversy between the plaintiffs on one side and the defendants, the union organizations, on the other, concerning hours of labor and wages in the jewelry trade, and the recognition by the plaintiffs of defendants' trade union organization, especially Local Union No. 41. It is averred that each of the plaintiffs refuses and has refused "to consider or treat with the defendants' organizations, or any of them, or to consider or agree to recognize the existence of defendants' organizations, or any of them, for the purpose of collectively bargaining or collective treatment, consideration, or settlement of any trade dispute or controversy of the defendants between the plaintiffs as employers and the defendants' organization of employees, or to recognize the existence of defendants' organization for any purpose whatever"; that in pursuance to maintaining the defendants' side of said trade dispute and

controversy Local Union No. 41 of the International Jewelry Workers Union has employed, and still "employs, pickets to walk on the public streets and on the sidewalks adjoining the stores of some of the plaintiffs, to advise and warn the passers-by that the said plaintiffs are unfair to the defendants and to their trade union organizations and to organized labor"; and that—

"To the end and for the purpose and with the hope that all members who are or may be in sympathy with the defendants' organizations, and with the rights of organized labor to bargain collectively, shall and will patronize other jewelers and shops and merchants and employers who are in sympathy with the objects and purposes of defendants' trade unions, and who have recognized and do recognize and treat with the defendants' trade unions and with their employees collectively, and that the employment of said pickets is to benefit and help the said friends of defendants who are employers and merchants, and, if such benefits to defendants' friends result in an injury to the plaintiffs, it is merely an incidental result of the defendants' efforts to benefit their friends."

The plaintiffs filed the following reply to the new matter in the answer:

"The plaintiffs * * admit the allegations thereof, except that the plaintiffs deny that the employment of the pickets therein alleged is only to benefit and help the friends of the defendants who are employers and merchants, but allege that the employment of said pickets is intended by defendants to injure the plaintiffs in the conduct of their business, and to deprive them of customers, in order to coerce and to compel the plaintiffs to recognize the defendant union, and to make contracts with the defendant union, and deny that, if such benefit to defendant's friends results in an injury to plaintiffs, it is merely an incidental result of defendants' efforts to benefit their

friends, but that the truth is that any benefit to the defendants' friends is an incidental result of the injury intended to be inflicted upon the plaintiffs."

It was stipulated by the parties that Local Union No. 41 "is commonly called a trade union instead of a labor union"; that the members and officers of said union have the vocation of watchmakers, stonesetters, etc., and are working and operating as such for employers engaged in the same class of business as the plaintiffs; that the defendant Central Labor Council has no power to order or direct the different labor unions, did not employ or pay any of the pickets, and has no authority to say who should be employed, but that it "has approved and indorsed said strike and the placing of the parties on the unfair list, and is authorized to do so under the rules and regulations of the American Federation of Labor": and that—

"It is admitted that they have caused pickets to walk in front of and near the plaintiffs' places of business on the sidewalks and in the streets, wearing banners and scarfs conspicuously displayed on their persons, inscribed with words, in effect, 'Unfair to Organized Labor,' and while so walking to address people generally, warning and advising them not to patronize said plaintiffs, on the grounds stated by them that plaintiffs were not fair to organized labor, and advising the people generally to patronize those that were fair to organized help."

The defendants also admit by stipulation that they intend "to continue picketing in the future" as they have in the past, "unless restrained by order of the court"; and that during all the time of picketing the plaintiffs "had many customers desiring to trade with them."

Testimony was taken in open court, and based upon the evidence, such stipulations and admissions in the pleadings, the court made numerous findings of fact and conclusions of law, and entered a decree to the effect that the defendants, and each of them, be enjoined and prohibited from picketing the places of business of the plaintiffs—

"by stationing pickets at or near the said places of business, and from the said pickets displaying a banner inscribed 'Unfair to Organized Labor,' or words of similar import, and from addressing the customers, or other persons, or persuading, influencing, or intimidating plaintiffs' intending customers, or other persons, from entering into the said places of business of the said plaintiffs or buying goods therein, and from adopting and carrying out any other similar means for the purpose of accomplishing the object of the said conspiracy, to wit: to injure the plaintiffs' said business."

The defendants appeal, contending that the findings do not support the decree, for the reason that there was no evidence that "the defendants resorted to or used any other than peaceful and lawful means of communicating information, and of persuading people not to patronize or work for the plaintiffs, or that the defendants planned to injure the plaintiffs in their business and to deprive them of their customers without finding that the defendants were seeking to benefit themselves," or that the defendants were insolvent. They also insist that the court erred in issuing the injunction prohibiting them from picketing by stationing pickets at or near plaintiffs' places of business, from displaying any banner or sash inscribed, "Unfair to Organized Labor," and from adopting or carrying out any other similar means, "for the purpose of accomplishing defendants' object of inducing the plaintiffs to recognize the defendants' union and

to contract and agree for the eight-hour work day and minimum wage of $36 per week.''

The case was heard before Judges W. N. Gatens, John P. Kavanaugh, and George W. Stapleton, the last two of whom rendered a decree from which this appeal is taken. For the reason that there were other similar cases in the lower court, in which they were attorneys of record, permission was granted such attorneys to appear as *amici curiae* and file briefs and make oral arguments in this court.

Affirmed.

For appellants there was a brief over the names of *Mr. W. S. U'Ren* and *Messrs. Davis & Farrell,* with oral arguments by *Mr. U'Ren* and *Mr. W. E. Farrell.*

For respondents there was a brief over the names of *Mr. Martin L. Pipes, Mr. George A. Pipes* and *Mr. John M. Pipes,* with an oral argument by *Mr. Martin L. Pipes.*

There was a brief and an oral argument, *amicus curiae,* by *Mr. Roscoe C. Nelson.*

JOHNS, J.—Through the candor and frankness of opposing counsel, the vital issues in this case are clearly defined. Under the plaintiffs' theory, the defendants entered into a conspiracy to compel the plaintiffs to recognize their union, and to that end placed pickets in front of their places of business to drive and keep customers away, by reason of which the plaintiffs suffered material damage. The defendants admit the picketing, but claim that it was peaceable and lawful; that it was done for the protection and furtherance of their own interests; and that they had a right to do it, even though the plaintiffs were

damaged as a result. What was done by the pickets
is told by the following testimony of Isaac Aronson,
one of the plaintiffs:

"The young ladies wore sashes or banners across
their shoulder, with inscriptions reading on them,
and the people coming in the store, they used various
phrases which we have taken pains at that time to
have exactly some of the words as they said; we took
down a stenographic report. They talked in a very
loud tone of voice. The store is 37 by 15; you could
hear it all over the store; and we were compelled to
keep the doors closed hot summer days, because that
was so annoying to customers purchasing goods in
the store. The phrases they used are as follows: 'Do
not patronize this shop; that man is unfair to union
labor.' 'Bring your watch to a watchmaker who is
making more than $10 a week.' 'If you are a friend
of the laboring man or woman, you will not patronize
that shop.' 'This shop is unfair to all organized
labor.' 'Do not patronize that store; it is unfair.'
'Patronize a shop that pays a living wage.' 'All we
ask for is six days a week and eight hours a day and
a living wage.' 'Do not patronize this shop; patron-
ize a union shop—a union shop pays living wages.'
'Do not buy anything of them; you are liable to die
of heart failure.' 'Buy your watches of Staples; he
pays union wages.' 'Patronize a union shop; a union
shop employs white help, not colored help, and pays
a living wage.' 'This man employs colored help; he
is an enemy to labor.'"

The origin of the trouble, according to the plain-
tiffs' view, is given in the following testimony of the
same witness:

"Some time between August 4th and August 15th, I
couldn't say the exact date, Mr. Anderson wanted an
interview with me.

"Q. Mr. Anderson, president of the Central Labor
Council?

"A. Yes. It was agreeable to me, and Mr. Anderson came to my office; we talked the matter over in an amiable way. I found Mr. Anderson to be very gentlemanly, and we did come to an agreement; that is, waiving the matter of a contract, waiving the matter of closed shop, the only thing they would insist on was the matter of wages, which we paid, which was agreeable, and the matter of hours which we keep, which was agreeable; and we agreed upon, Mr. Anderson and I, that I will call a meeting of the jewelers in controversy, and Mr. Anderson would send a delegate from the jewelers' trade union, and Mr. Anderson should be present, and verbally we will state to them we will pay them the wages, and we will give them the hours, and that should constitute the contract, and Mr. Anderson agreed with me. Next day Mr. Anderson came to me and said, 'Mr. Aronson, did you arrange for that meeting?' I said, 'Yes; the meeting is arranged for 10 o'clock.' He said, 'You will also have to state in there that you are recognizing the union.' I said, 'Mr. Anderson, it can't be done, because I have called the jewelers together on these points only, in reference to hours, wages, and overtime, and not about recognizing the union.' In fact, I took out a memorandum that I wrote down in his presence. I said, 'Here is the memorandum I made out; I cannot make a fool out of myself by calling a meeting.' In fact, I stated to them on what terms we are going to agree upon, and I told Mr. Anderson, 'It is up to you to put the pickets back right now.' I was rather peeved about it; I considered I have been made a fool of at that time; and they put the pickets back. That is the time the pickets were off one day and a half.

"Q. The whole trouble on the part of your jewelers' association is you will not recognize the union, and will not do business with the union as a union?

"A. That appears to be the trouble, although we conceded we would talk with their representative; but we didn't consider a contract was necessary, because all that was demanded in the original contract was already paid before."

Frank Heitkemper, one of the plaintiffs, called as a witness by the court, testified as follows:

"We were approached about the early part of July, and were asked by some of the people prominent in labor circles if there would be any objection to their coming in and taking up the matter with our employees concerning whether or not they would belong to the union. I told them I had no objection. I had in mind that possibly to join the union would make conditions mutually better for us, as well as the workmen. I paid no attention to it, but I knew some negotiations were going on toward forming the union. I didn't care, as I told them; we never asked a man whether he belonged to any lodge or church, or any organization; that we hired them as free American citizens, and never would question what they wanted to do. About the middle of July we received through the mail a union agreement. I glanced at it and dismissed [it] from my mind, because it had some conditions in there that were absolutely impossible for us to comply with. As far as wages were concerned, as I said, we paid as high as $45 at that time. Watchmakers were scarce, and it wasn't a question of wages. * * We passed it up. About the 23d or 24th of July a man came in who introduced himself as president of the jewelry workers' union, and wanted to know why we hadn't signed this up and sent it in. I discussed the matter with him, and told him I couldn't and square myself with my own conscience, sign it. He told me then, after a little discussion, he said it as sort of an ultimatum, that, if we didn't sign that by 5 o'clock Saturday, at 11 o'clock Monday morning they would call our watchmakers out. I didn't think our watchmakers would go out, to tell the truth. None of them were in position to be idle, I didn't think. At 11 o'clock Monday morning they laid down their tools and walked out. I considered it a joke for a while. After two or three days of this I realized I hadn't taken the thing up with them, except in an ordinary way, hadn't stated my position to them, and I asked them to come in and

talk it over. We met with five of the men, I dis-
cussed the matter with them. I asked them, 'Is there
any dissatisfaction with you people in regard to
wages?' They said, 'No; we all feel we are paid in
proportion to what we can earn.' I said, 'Is there
any question in regard to hours?' They said, 'No;
we are satisfied with the hours; we realize you have
always been in the front rank when it came to grant-
ing good conditions; we feel when there is a con-
certed motion to put in shorter hours you will be one
of the first to go into it.' I said, 'Is there anything
personal, any reason why you don't want to work for
me?' They said, 'No.' They said they never worked
with a man they liked better than me. I said, 'What
is the trouble?' 'Well, we belong to the union; we
can't work here until you sign this union agree-
ment.' ''

The theory of the defendants is explained by the
testimony of Harry Anderson, president of Central
Labor Council, thus:

''Some time before July 1st, the jewelers' workers'
organization sent out to each of the jobbing houses
and the manufacturing jewelers, and different jewelry
stores, a copy of their new agreement, which pro-
vided a $36 minimum, an eight-hour day, and certain
other regulations, as well as closed shop. The
jewelry workers did not get any response. They
were young, and didn't know how to go about meet-
ing the various proprietors to find out whether this
was acceptable or not. Finally they decided the
thing to do was to call a strike.''

The witness also testified to certain negotiations, as
follows:

''So Mr. Hartwick and myself called on Mr. Heit-
kemper. They told us practically the same thing;
telling us it was mighty difficult to get these jewelers
into a meeting. At that time I asked Mr. Heitkemper
if he thought if a letter was sent to them from the
council requesting them to attend a meeting with offi-

cers of the council, that it would do any good. He said he didn't know, we might try. So a letter was sent out. We received no reply from that letter. After that the jewelry workers decided at a meeting that the thing to do was to call a strike, to see if they couldn't force the issue that way. They did call a strike. They came into the Central Labor Council, requesting these various places be placed on the unfair list. * *

"Mr. Friedlander and Mr. Aronson both told me so far as they were concerned they were perfectly willing to send in such a letter to the Central Labor Council. I suggested to them many times that if this were done it would avoid all this trouble, and that we could settle the whole matter on that basis. * *

"Q. What reason did they give for refusing to put their agreement in writing. They were willing to make such a statement; why wouldn't they put it in writing?

"A. I felt all the time the objection was principally because they didn't care to recognize the jewelry workers as an organization.

"Q. Would they give any reason for refusing to sign such an agreement?

"A. Their reasons were, they had held a meeting and decided not to sign it.

"Q. They didn't tell you why they wouldn't sign? Are they working the eight-hour shift now in the stores of these plaintiffs?

"A. That I couldn't say.

"Q. Do you know what scale of wages these plaintiffs were paying before an organization was made of the jewelry workers' union?

"A. At this meeting held in our office it developed some of them were paying more than the minimum asked by the jewelry workers, some less.

"Q. They were all working nine hours at that time?

"A. I don't remember as to that. * *

"Q. What does your ordinary form of contract provide with respect to closed or open shop?

"A. It provides for practically a closed shop. It provides that jewelry store proprietors or manufacturers, whoever they may be, may employ in the open market regardless of union affiliations, but at the end of thirty days they must make application for membership in the union or be dismissed. * *

"Q. I take it from the statements on the stand, and yourself as well, that they felt there was a distinction between writing a letter and signing the formal contract. One was a direct recognition of the union as a body, and that, they would be contracting with the union when they didn't desire to do that, when they were willing to give the minimum wage asked and observe the eight-hour day, but wanted the power left to employ whom they pleased and discharge whom they pleased, and without discrimination; that was the distinction?

"A. Yes."

There is no real dispute between the plaintiffs and the defendants as to wages, hours of labor, treatment, or conditions of employment.

Chapter 346, Laws 1919, entitled:

"An act declaring labor unions to be lawful organizations; restricting the powers of any court of this state in the granting of injunctions; declaring the labor of a human being not a commodity or article of commerce; prohibiting the indictment, prosecution or trial of any person or combination of persons for any act in furtherance of the bettering of his or their condition, unless such act should be forbidden by law if done by an individual,"

—provides in part as follows:

"Section 1. It shall be lawful for working men and women to organize themselves into, or carry on labor unions for the purpose of lessening the hours of labor or increasing the wages or bettering the conditions of the members of such organizations; or carrying out their legitimate purposes as freely as they could do if acting singly.

"Section 2. No restraining order or injunction shall be granted by any court of this state, or any judge or judges thereof in any case between an employer and employee, or between employer and employees or between employees or between persons employed and persons seeking employment, involving or growing out of a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right of the party making the application, for which injury there is no adequate remedy at law. * *

"Section 3. No restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment or from ceasing to perform any work or labor; or from recommending, advising or persuading others by peaceful means so. to do; or from attending at any place where any person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any such person to abstain from working; or from ceasing to patronize any party to such dispute; or from recommending, advising or persuading others by peaceful means so to do. * *

"Section 5. No person shall be indicted, prosecuted or tried in any court of this state for entering into or carrying on any arrangement, agreement, or combination between themselves made with a view of lessening the number of hours of labor or increasing wages or bettering the conditions of working men and women, or for any act done in pursuance thereof, unless such act is in itself forbidden by law if done by a single individual."

Prior to the organization of defendant Local Union No. 41, known as a trade union, there was no jewelry workers' union in the City of Portland, and there was no controversy between the plaintiffs and their employees. After this union was formed, it sent circular letters to all of the jewelers in Portland, including the plaintiffs, requesting a conference with a view

of inducing the plaintiffs to conduct their respective places of business under the rules and regulations of the union as to wages, hours of labor, apprentices, right of inspection, settlement of grievances, pay for overtime, and in general to conform to all of its standard requirements. The plaintiffs received, but did not answer, this letter. In a short time the union sent out another request, calling attention to the first, and asking for a prompt reply, to which the plaintiffs again paid no attention. This was soon followed by a meeting of the members of defendant Local Union No. 41, in which they voted almost unanimously to declare a strike, and advised the Central Labor Council of their decision. This latter organization then placed the plaintiffs on the unfair list, and at once the defendants, acting through Local Union No. 41, commenced the picketing complained of. It appears from the record that only two of the plaintiffs were actually subjected to the picketing, but it is agreed that the defendants intend to picket all of the plaintiffs unless enjoined.

After this demonstration was commenced, there were certain negotiations between the plaintiffs and the defendants with a view of trying to settle and adjust their differences. A tentative agreement was made between the plaintiff Aronson and Harry Anderson as president of the defendant Central Labor Council, to the effect, as Mr. Aronson testifies, that "the only thing they did insist on was the matter of wages which we paid, which was agreeable, and the matter of hours which we keep, which was agreeable"; that a meeting of all interested parties should be called, at which the plaintiffs should verbally state, "We will pay them the wages and we will give them the hours," and that this should constitute the con-

99 Or.—2

tract between them. On the following day, according to Aronson, Anderson inquired if he had arranged for the meeting. The witness told him that it had been called, whereupon—

''He said, 'You will have to state in there that you will recognize the union.' I said 'Mr. Anderson, it ·can't be done, because I have called the jewelers together on these points only, with reference to hours, wages, and overtime, and not about recognizing the union.' In fact, I took out a memorandum that I wrote down in his presence, and I said, 'Here is the memorandum that I made out.' And I told Mr. Anderson, 'It is up to you to put the pickets back right now.' And they put the pickets back.''

The substance of this testimony is not disputed. The record shows that as a result of different conferences between Anderson as president of Central Labor Council and Aronson on behalf of plaintiffs, there was a tentative agreement reached, by which the plaintiffs were to adopt the union scale of wages and conform to the union hours; that a meeting was called for the purpose of ratifying that arrangement; that it was understood by all parties that it would be approved; and that the pickets were removed pending the meeting. After the notice of the meeting had been sent out, Anderson called upon Aronson and notified him, ''You will have to state in there that you will recognize the union,'' which the latter declined to do for want of authority. For such reason the meeting was never held and the picketing was resumed.

There is nothing in the testimony to show that. there was ever any dispute about wages, hours of labor, or conditions of employment. Through the original conferences all of such matters had been amicably adjusted, subject only to formal approval;

but the agreement was never actually ratified because the defendants insisted thereafter that the plaintiffs recognize the union, which the latter refused to consider. As we construe the record, the recognition of the union was the only real dispute between the parties.

The defendants rely upon Chapter 346, Laws 1919, the material provisions of which are quoted above. Section 2 thereof says that no restraining order or injunction shall be granted ''between an employer and employee, or between employer and employees, or between employees or between persons employed and those seeking employment, involving or growing out of a dispute concerning terms or conditions of employment.'' This is not a controversy between employer and employee, or between individuals employed and those seeking employment; nor does it arise from, or grow out of a dispute as to terms or conditions of, employment. Neither does Section 3 of the act apply. This is not a case of terminating employment, ceasing to perform work or labor, or recommending, advising or persuading others to abstain from working, or attending the plaintiffs' places of business for any of the objects mentioned in the enactment. Here there is no dispute between employers and employees, and the pickets were not stationed in front of plaintiffs' stores to persuade anyone to cease from working, or for the purpose of obtaining or communicating information for the use and benefit of the union. The words, ''any party to such dispute,'' refer and relate to controversies between employer and employee, to the termination of employment, and to the ''persuading any such person to abstain from working.''

1. We hold that under the facts in this case, Chapter 346, Laws 1919, does not embrace or legalize picketing a man's place of business and destroying his patronage where the only question involved is the recognition of the union.

2. The complaint is founded upon conspiracy, and on that point the alleged and admitted facts bring the case within the purview of *Alaska S. S. Co.* v. *International Longshoremen's Assn. of Puget Sound et al.* (D. C.), 236 Fed. 964, which holds:

"A conspiracy is a combination of two or more persons by concerted action to do an unlawful thing, or to do a lawful thing, in an unlawful manner.

"No formal agreement is necessary to a conspiracy, a tacit understanding being sufficient; and it is not essential that each conspirator have knowledge of the details, the means to be used, or that the agreement be enforceable.

"The acts of agents and employees in furtherance of a conspiracy are the acts of the principal.

"Where a picket around an employer's place of business is established by union strikers, the picket is the agent of the union, and efforts to dissuade others from accepting employment offered by the former employer should go no further than peaceable persuasions and inducements."

In the instant case, soon after the second circular letter was mailed, for failure to reply, the defendant Local Union No. 41 met and called a strike, notifying the Central Labor Council, which placed the plaintiffs on the unfair list, and pickets were at once stationed about the places of business of two of the plaintiffs. Although it is true that the defendant Local Union No. 41 employed and paid them, yet it was the result of united and concerted action.

Regardless of any statute bearing on the subject, every fair-minded man must concede that labor has

a right to organize and to use any and all lawful means to further and protect its own interests, and that in the absence of contract any individual, with or without cause, has a right to terminate his employment at any time and without notice. Organized labor is organized brain' and muscle. It has all the legal rights of any other association, and in this state they are specifically recognized by Section 1 of Chapter 346, Laws 1919. It must also be conceded that through its organization much good has been accomplished; that there has been a marked and material improvement in labor conditions, in particular as to wages, hours of working, environment, and treatment, and that it has resulted in closer and more intimate relations between employer and employee. Much legislation has been enacted enforcing and recognizing such rights; some of it has been cheerfully done on principle and as a matter of justice, and some of it is the result of long and bitter contest between employer and employee, whereby the public in general, although not directly a party, has been made to realize that it has a vital interest in all of such questions. But under the existing facts the question is squarely presented, whether or not, in the absence of a statute conferring such power, any organization has the right, even peacefully, to picket a man's store, drive away his patrons, materially injure his business, and continue to do so, for the sole purpose of compelling him to recognize the union.

In the instant case it is but fair to say that no large crowds were assembled; that the sidewalks were not seriously obstructed to passers-by; that but little offensive or abusive language was used, and no violence; and that at the inception one of the pickets was removed by the defendants on account of the

language she used. The pickets wore banners inscribed "Unfair to Organized Labor," and stood at, near, and in front of the entrances of the plaintiffs' places of business. Their efforts were largely directed, and more or less confined, to dissuading and preventing intending patrons from going into the stores and doing business with the plaintiffs. While the pickets were not boisterous, there is testimony tending to show that their presence provoked argument and discussion. The evidence is conclusive that the picketing was effective; that there was a material reduction in the volume of business of the plaintiffs who were subjected to it; and that they sustained a substantial injury. It commenced daily with the opening of the stores in the morning and continued during business hours. There was no interference by the police and no arrests were made. While all that is true, the record shows that the relation of employer and employee did not exist, and that the strike was called, plaintiffs were placed on the unfair list, and their stores were picketed, without any further notice or warning. When the evidence is analyzed, it clearly appears that the primary purpose of the picketing was to compel recognition of the union, and that it was the defendants' intent to make it continuous.

Even where the relation of employer and employee is shown to exist, and there is a dispute as to wages or hours of labor, there is a sharp conflict in the authorities as to whether there is such a thing as peaceful picketing. 24 Cyc. 834, 836, says:

"While it has been held that the mere stationing persons near the premises of another for the mere purpose of observing and obtaining information, for the purpose of conveying information to persons seeking or willing to receive the same, or for the pur-

pose of using orderly and peaceful persuasion with those willing to listen, does not in itself constitute intimidation if done in a peaceful manner, the rule has been repeatedly laid down that the keeping of patrols in front of or about the premises of the employer, accompanied by violence or any manner of coercion to prevent others from entering into or remaining in his service, will be enjoined.

"The doctrine that there may be a moral intimidation which is illegal, announced by the Supreme Court of Massachusetts, was among the first judicial steps taken in this country toward overturning the rule permitting peaceable picketing laid down in the first clause of this paragraph, and was a forerunner of the later rule, that there can be no such thing as peaceable picketing, and consequently that all picketing is illegal. Picketing will be enjoined as a continuing injury to business notwithstanding it may be punishable as a crime, and the right to injunction against it has been based upon the ground that the aggrieved person is entitled to protection of his 'probable expectancy' which is defined as the right to enjoy a free and natural condition of the labor market."

16 R. C. L., page 454, states that the courts which "condemn picketing *per se* are in a decided minority." Martin on the Modern Law of Labor Unions, page 233, Section 169, says:

"Although, as was shown, there are some decisions which hold that all picketing is unlawful, and it has been said that from the very nature of things peaceful picketing is of rare occurrence, and 'very much of an illusion,' yet the view taken by the majority of decisions, and which is best supported by reason, is that picketing, if not conducted in such numbers as will of itself amount to intimidation, and when confined to the seeking of information, such as the number and names and places of residence of those at work, or seeking work, on the premises against which the strike is in operation, and to the use of peaceful

argument and entreaty for the purpose of procuring such workmen to support the strike by quitting work, or by not accepting work, is not unlawful, and will furnish no ground for injunction, or an action at law for damages.''

12 C. J., page 597, Section 140, states the rule thus:

''According to the better view, picketing, if not conducted in such numbers as will of itself amount to intimidation, and when confined to the seeking of information, such as the number, names, and places of residence of those at work, or seeking work, on the premises against which a strike is in operation, and the use of peaceful argument and entreaty for the purpose of inducing such workmen to support the strike by quitting work or by not accepting work, is not unlawful, and furnishes no ground for an action for damages.''

But distinguished counsel have not cited, and after diligent search we have not found, any authority which would justify or sustain picketing, even though it be peaceable, where the controversy is not between employer and employee, and there is no dispute growing out of employment, but the purpose of the picketing is to induce the employer to recognize the union. As we analyze the authorities, the legal right peacefully to picket is largely dependent upon the purpose and intent, and the method and manner in which the picketing is done.

3. Assuming that the plaintiffs sustained material injury, the defendants vigorously contend that it was the result of picketing which was both peaceful and lawful, and that the damages were only incidental, for which plaintiffs would not have any right of action; in other words, that it would be *damnum absque injuria*. Under another state of facts that legal principle would be sound, and sustained by the authorities;

but in applying the rule both the facts and the motive
are important.   We find the following in 12 C. J., page
584, Section 103:

"So long as the object of the combination is to
further its own fair interest or advantage, and not the
injury of another, its members are not liable for any
injury which is merely incidental.   On the other hand,
such combinations are actionable conspiracies, al-
though the acts when done by an individual would not
subject him to civil liability, when the acts are done
with malice; that is, with the intention to injure an-
other without just cause or excuse, or where the
natural and necessary consequences of the act, al-
though done to benefit the conspirators, is the prejudice
of the public of the oppression of individuals.   Inten-
tionally to do that which is calculated, in the ordinary
course of events, to damage another in his property or
trade is, when done without just cause or excuse, what
the law calls an actionable wrong.   Just cause or ex-
cuse exists only where the injury inflicted is the means
to some end legitimately desired and incidental there-
to, and is not the result of a specific intent and immedi-
ate purpose of injury to others that benefit may ulti-
mately come to the members of the combination.   It is
entirely wanting when the immediate purpose of the
combination is to inflict injury on others, and the bene-
fit, if any, to result to the combination, is indirect and
remote.   An agreement entered into for the primary
purpose of injuring another is not rendered legal by
the fact that it may incidentally benefit the parties."

5 R. C. L., page 1074, Section 15, says:

"Here it may be said that a labor union or a combi-
nation of laborers for the purpose of effecting a strike
for a justifiable purpose is not a conspiracy unless it
contemplates the use of unlawful means.   On the other
hand, a combination to strike for a purpose not recog-
nized as justifiable is a conspiracy."

The opinion in *Hitchman Coal & Coke Co.* v. *Mit-
chell et al.,* 245 U. S. 239 (62 L. Ed. 260, Ann. Cas.

1918B, 461, L. R. A. 1918C, 497, 38 Sup. Ct. Rep. 65), reads thus:

"In any aspect of the matter, it cannot be said that defendants were pursuing their object by lawful means. The question of their intentions—of their *bona fides*—cannot be ignored. It enters into the question of malice. As Bowen, L. J., justly said, in the *Mogul Steamship Case,* 23 Q. B. Div. 613: 'Intentionally to do that which is calculated, in the ordinary course of events, to damage, and which does, in fact, damage, another in that other person's property or trade, is actionable if done without just cause or excuse.' * *

"Another fundamental error in defendants' position consists in the assumption that all measures that may be resorted to are lawful if they are 'peaceable' —that is, if they stop short of physical violence, or coercion through fear of it. In our opinion, any violation of plaintiff's legal rights contrived by defendants for the purpose of inflicting damage, or having that as its necessary effect, is as plainly inhibited by the law as if it involved a breach of the peace. A combination to procure concerted breaches of contract by plaintiff's employees constitutes such a violation. * *

"Upon all facts, we are constrained to hold that the purpose entertained by defendants to bring about a strike at plaintiff's mine in order to compel plaintiff, through fear of financial loss, to consent to the unionization of the mine as the lesser evil, was an unlawful purpose."

Although that opinion was written in December, 1917, the original suit was commenced on October 24, 1907; hence, the decision was founded upon the common law. The facts there are different, but the legal principles announced and the reasons therefor are squarely in point here.

In *Plant* v. *Woods,* 176 Mass. 492 (57 N. E. 1011, 79 Am. St. Rep. 30, 51 L. R. A. 339), it is said:

"But in many cases the lawfulness of an act which causes damage to another may depend upon whether

the act is for justifiable cause, and this justification may be found sometimes in the circumstances under which it is done, irrespective of motive, sometimes in the motive alone, and sometimes in the circumstances and motives combined."

In *Connors* v. *Connolly et al.,* 86 Conn. 641 (86 Atl. 600, 45 L. R. A. (N. S.) 564), the opinion reads as follows:

"The law recognizes that human activities are not to be so circumscribed that one may not, in his efforts to advance his own interests, either himself or in co-operation with others, do anything from which another may suffer. * * But it does recognize that certain bounds must be set to the use of means, beyond which he and his associates may not be permitted to go, if a decent regard for the rights of others is to be preserved and the public welfare conserved. It recognizes the peculiar necessity for the establishment of such bounds where the action is that of individuals in combination, by reason of the great power which may result from such combination, and the temptation to use that power in disregard of the rights of persons outside of them. * *

"One of the bounds thus fixed, where, as here, concerted action by combinations is concerned, is that the harm inflicted be reasonably referable to the alleged object of lawful gain or advantage; that the means employed be adopted in good faith for the attainment of that object; and that their employment be not prompted by personal ill will, desire to injure, or express malice of any sort. * *

" 'The common law has long recognized, as part of the boasted liberty of citizens, the right of every man to engage freely in such lawful business or occupation as he himself may choose, free from hindrance or obstruction by his fellowmen, saving such as may result from the exercise of equal or superior rights on their part.' "

This question was decided in *Folsom* v. *Lewis,* 208 Mass. 336 (94 N. E. 316, 35 L. R. A. (N. S.) 787). In

that case the master found "that one of the objects of the strike was to compel the employers to recognize the union, and to enter into an agreement with the union as such, to employ none but union men, or non-union men provided they should join the union within thirty days, and have a certificate of the right to work until the time that they had joined the union, that the strike was a strike for the closed shop," and that in such particulars it was not for a lawful purpose. In its opinion the court said:

"There is nothing in the case to indicate that there was anything in the condition of the business, or in the relations of the workmen to their employers, that made such a requirement of any importance to these employees, in reference to their profit or comfort. * * The master was undoubtedly right in finding that the purpose of the defendants and the real object of the strike were not so much to obtain certain slight advantages referred to in the proposed agreement as to compel the employers, by inflicting this injury upon them, to submit to an attempt to obtain for the union a complete monopoly of the labor market in this kind of business, by forcing all laborers who wished to work to join the union, and by forcing all employers to agree not to employ laborers, except upon such terms as they could make with the combination that should control all labor in this business. This has been held to go beyond the limit of justifiable competition. Conduct directly affecting an employer to his detriment, by interference with his business, is not justifiable in law, unless it is of a kind and for a purpose that has a direct relation to benefits that the laborers are trying to obtain."

Authorities sustaining this decision are cited in the L. R. A. notes.

Under the facts shown to exist in the instant case, we hold that Chapter 346, Laws 1919, does not apply; that the relation of employer and employee did not ex-

ist; that there was no real or vital dispute about the scale of wages, hours of labor, or pay for overtime; and that the primary purpose of calling the strike, placing the plaintiffs on the unfair list, and picketing their places of business was to obtain the recognition of the defendant Local Union No. 41. Under such a state of facts, the damages are not incidental to the legal right of the defendants. It appears from the record that the defendants are insolvent, and that the plaintiffs have sustained material injury to their business, which will be continuous if the defendants are permitted to picket, and for which the plaintiffs would not have a complete and adequate remedy at law even in a multiplicity of actions. The decree of the Circuit Court is affirmed on the merits, but for the reason that this is in the nature of a test case, it is modified as to costs, which neither party shall recover in either court.                     AFFIRMED.   REHEARING DENIED.

MCBRIDE, C. J., and BENSON, BURNETT and HARRIS, JJ., concur.

BEAN, J. (Dissenting).—I am unable to come to the conclusion reached by Mr. Justice JOHNS, to the effect that there was no actual dispute existing at the time of the acts complained of. At the session of the legislature in 1919, Chapter 346, General Laws of Oregon for that year, was enacted, among other things declaring labor unions to be lawful organizations, and restricting the powers of any court of this state in the granting of injunctions. Section 2 of that act provides:

"No restraining order or injunction shall be granted by any court of this state, or any judge or judges thereof in any case between an employer and

employee or between employer and employees or between employees or between persons employed and persons seeking employment, involving or growing out of a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right of the party making the application, for which injury there is no adequate remedy at law. * * ''

Section 3 directs in part that—

''No restraining order or injunction shall prohibit any person or persons whether singly or in concert, from terminating any relation of employment or from ceasing to perform any work or labor; or from recommending, advising or persuading others by peaceful means so to do; or from attending at any place where any person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any such person to abstain from working; or from ceasing to patronize any party to such dispute; or from recommending, advising or persuading others by peaceful or lawful means so to do; * * or from doing any act or thing which might lawfully be done in the absence of such dispute by a single individual; or shall any of the acts specified in this section be considered or held to be illegal or unlawful in any court of the state.'' ·

It is apparent that the last ''or'' was intended to be ''nor.''

As shown by the majority opinion—and I find no contradiction of the testimony—about July 1st Local Union No. 41 sent out to each of the jobbing houses and the manufacturing jewelers a copy of their new agreement which provided a $36 minimum wage per week, an eight-hour day, regulations as to apprentices, right of inspection, settlement of grievances, pay for overtime, and requiring the plaintiffs to conduct their business according to the standard requirements of

Local Union No. 41, known as a trade union.  Mr. Harry Anderson, president of the Central Labor Council, testified in part:

"Q. Do you know what scale of wages these plaintiffs were paying before an organization was made of the jewelry workers' union?

"A. At this meeting held in our office it developed some of them were paying more than the minimum asked by the jewelry workers, some less."

There was an effort by, and a consultation between, the plaintiffs as employers and the officers of the Central Labor Council on behalf of the employees, to have the plaintiffs attend a meeting with the officers of the council to consider the matters mentioned in the circular.  This was unavailing, and a strike was called on account of the failure to agree.  There was an effort made to have a conference.  According to the testimony of Mr. Isaac Aronson, one of the plaintiffs, in an interview with Mr. Anderson, president of the Central Labor Council, they talked the matter over amicably, and he states, "We did come to an agreement, that waiving the matter of a contract."  It was agreed that Mr. Anderson should call a meeting of the jewelers and Mr. Anderson would send a delegate from the jewelers trade union and also be present himself.  This meeting was never held.  The so-called "tentative" agreement was never consummated.  It was a mere proposition, which was never accepted, and whatever the reason therefor, no settlement of the dispute was ever made.  It may be true, the object of the labor council, and the object of the associated jewelers were at variance.  That does not change the fact that the minimum wage, $36, and other labor conditions shown to exist between the employers and employees interested, were never adjusted.  They were left un-

settled, subject to change at any time. The dispute led to a strike. It is not the province of the court to determine which of the contending parties were right in the matter of the dispute or to make an agreement for them.

Therefore, following the rule laid down in the companion case of *Greenfield* v. *Central Labor Council*, 192 Pac. 783, and under the sanction of the statute recently enacted, the defendants had the right, in a peaceful and lawful manner, of persuading persons, by peaceful and lawful means, to cease to patronize the plaintiff employers who were parties to the dispute. The question goes to the very foundation of the right of labor to organize for its benefit, and to protect and better the terms and conditions of employment. According to the command of the statute, an injunction cannot be issued. It is not for the court to annul the act of the legislature.

BENNETT, J. (Dissenting).—The plaintiffs in this case are nine of the largest and strongest jewelry firms of the City of Portland, associated together for the purpose of bringing this suit.

The defendants are certain labor organizations and their officers. The principal defendant is Local Union No. 41 of the International Jewelry Workers' Union. This defendant is an organization of the jewelry workers of the City of Portland, employed in the manufacture and repair of jewelry. The suit was brought to enjoin the defendants from picketing the respective places of business of the plaintiffs, in the course of a labor controversy between the labor union, representing the employees, and the plaintiffs, their employers.

This controversy centers around the right of the labor union to insist upon *collective bargaining* by the

union, on behalf of its members, who are employees of these respective jewelry firms. There is no controversy presented in the case, in relation to the "closed or open shop," and while the question of wages and hours was, at one time, in controversy between plaintiffs and their employees, yet it seems that they would have been able to agree in relation to that matter, if the question of collective bargaining could have been disposed of.

The history of the controversy, as admitted by all the parties, is in brief as follows: The plaintiffs had some disagreement, in the first place, with their employees, who are members of the defendant union, in relation to the matter of wages and hours. After some negotiations and discussion an agreement was about to be reached as to these matters, when the question came up as to whether the final contract should be entered into by the plaintiffs with the Jewelers' Union, as representing its members in the employ of the respective plaintiffs, or between the plaintiffs and each individual employee.

The defendants desired to have this arranged by a collective bargaining between the Jewelers Union, representing its members, while the plaintiffs refused to recognize the union, and insisted that the agreement should be directly between them and the individual employees. Both sides were obstinate, and the controversy finally resulted in the plaintiffs being declared "unfair" by the labor unions, who installed a system of picketing the places of business of two of the plaintiffs, and threatened to likewise picket the other plaintiffs.

The picketing was mostly done by young women wearing sashes, upon which were the words "Unfair to Organized Labor." These pickets marched up and

down the sidewalk in front of plaintiffs' places of business, and urged people entering these stores not to patronize the plaintiffs, because they were unfair to organized labor.

There is no serious claim that there was any violence or physical interference with the customers of the plaintiffs, and the contention of the plaintiffs is frankly placed upon the theory, that such picketing, even if peaceful, is unlawful.

It was alleged in plaintiff's complaint, and is stipulated to be true, that some of the employees of each of the plaintiffs were members of the Jewelers' Union, prior to the time of, the controversy.

As I view it, the questions presented in this case, when reduced to their last analysis, resolve themselves into this: Has a union, composed partly or wholly of the employees of the plaintiffs, the right to go upon the sidewalk in the vicinity of plaintiffs' places of business, and there persuade people, including their friends and sympathizers, to abstain from patronizing the plaintiffs, for the purpose of bringing the moral pressure of public opinion, and the influence of their friendship and patronage, to bear upon the plaintiffs, to induce them to deal with their employees collectively as a body instead of one by one individually? If they have this right, then the picketing in this case was lawful and should not be enjoined. If they have not, the picketing was unlawful.

If we view this question independently of the statutory provisions, and as a matter of common law, it resolves itself naturally into two propositions:

First. Have such employees, organized in a union, the general right to persuade their friends, and any others who may listen to them, to quit the patronage of the plaintiffs for the purposes set forth above?

Second. If they have that right generally, and it is lawful for them to exercise such persuasion in a general way, was their action rendered unlawful on account of the place where it occurred, viz.: on the sidewalk in front of plaintiffs' places of business?

Upon the first question—the general right of labor unions to persuade their friends and others to desist from patronizing a firm which seems to them to be unfair in its relations to organized labor—the authorities are in a hopeless and irreconcilable conflict. They are so numerous upon each side and so equally divided, that it would be an idle and useless task to attempt to discuss them individually, case by case. Almost every decision upon the question, whether one way or the other, has been made by a divided court; and the conflict between those where a majority of the court has held one way, and the cases where a majority of the court has held the other, is so absolute that about all one can say is, that in the aggregate the decisions throw no light of authority upon the question, and leave us to pass upon the matter as our individual judgment may direct.

Upon principle, it seems to me that the cases holding that the members of the labor union have such a right have much the stronger reasoning behind them, and are far more in accord with the general principles of law which may apply under similar conditions.

It is now universally conceded that the workingmen in any employment may organize and combine into labor unions, for the purpose of securing better conditions, and they may (in the absence of statutory provision) strike in concert and as a body for the purpose of persuading the employer to raise their wages, or to recognize collective bargaining.

I can see absolutely no reason why the members of the labor union, or the union as a body, have not the same right, for the same purposes, to peaceably and quietly persuade their friends and sympathizers, and such others as will listen to them, to patronize exclusively firms and business establishments which are friendly to the labor people and to their cause, and who are willing to deal with them as a body—to recognize the principles of collective bargaining, and any other principles for which they have a lawful right to contend, and to refuse to patronize such firms as are unfriendly to labor or to any of the principles for which their organization is contending.

All of us practice a similar right every day of our ordinary lives. If one of us buys a suit of clothes from a tailor, and thinks he treats him unfairly in any way, he tells his friends about it, and advises them and persuades them, if he can, to go to some other tailor to buy their clothes. If five or six of us, or twenty of us, or any number of us, think we have been treated unfairly by the same firm, we talk the matter over among ourselves, and go among our friends in the same way, and I can see no reason why we have not the same right to do so. If we go to a restaurant or a hotel and are not treated as we think we should be, we exercise the same right. Why should we deny to the labor people the same right to advise with and persuade their friends that we, ourselves, are constantly exercising?

It is frequently urged that the action of labor organizations, and their members, in such regard is coercive in its nature and for the purpose of compelling the employer to do something that he does not want to do, and would not otherwise do. No doubt there is an element of moral coercion, and one of the purposes

(but by no means all or the only purpose) upon the part of the labor union, is to compel the employer to do something which they think he ought to do, but which he would not otherwise do.

But it must be remembered and kept in mind that all moral coercion is not wrongful or unlawful. The very purpose of every organization of labor unions is always to compel the employer to accord them better wages and better conditions and to meet them upon fairer grounds. The concerted strike of laborers in an employment is always coercive in its purposes—to compel the employer to do something which he would not otherwise do. Yet all the authorities agree that both the organization and the strike are in themselves perfectly legitimate. Indeed, there is an element of moral coercion involved in almost every transaction in life where the interests of two or more people conflict.

If we refuse to buy sugar (as the fruit preservers have lately done) or dress in cheap garments for the purpose of lowering the price, in either case our purpose is coercive in exactly the same sense—to compel the dealer to sell at a lower price than he wishes to sell.

In this case Mr. Heitkemper was clearly using the same kind of coercion, when he refused to treat with his employees, because, as he says in his testimony:

"I didn't think our watchmakers would go out, to tell the truth. *None of them were in a position to be idle, I didn't think.*"

He was taking advantage of their necessities to compel them to work under conditions dictated by him—under conditions which they did not deem fair and which they did not want to accept.

Our criminal laws are based upon the idea of moral coercion. We punish a man to compel him and to compel others, to do things which they do not want to do, and to leave undone things which they would like to do. All of this is coercive in its purpose, but nevertheless there is no question but what the principle of such laws is right.

It follows, therefore, that the mere fact that steps taken by the labor organization are coercive, or undertaken for the purpose of compelling the plaintiffs to do something, in the manner of their dealing with their employees, which they do not want to do, does not show, or even tend to show, that such action by the labor union was wrongful or unlawful.

There are many things which a good man ought to do, which the law does not compel—many things which he ought not to do, which the law does not prohibit.

The pressure of public opinion to compel persons to do things which they ought to do, but which the law does not compel them to do, is only second to the law itself in its power for good. And I see no reason why the labor union should not have a perfect right to appeal to that public opinion, and bring its great moral pressure to bear upon the employers, in the constant conflict between capital and labor—employers and employees—and to ask and persuade everyone who is within their reach to be on their side, and to throw their influence and the influence of their patronage into the scale on behalf of the workingmen.

The employers have the same right to appeal to the public with their side of the controversy—a right which we all know they constantly exercise in many different ways.

Neither can we inquire here, as it seems to me, as to who is right and who is wrong, as to the principle

of collective bargaining. That is a moral question with which we have nothing to do, and which we ought to leave to the bar of the public opinion and public judgment, giving to each side of the controversy the right to fully present its claim and use all of its powers of peaceful persuasion. In this Republican land, there is no other power by which such questions can be adjudicated.

It is frequently urged, in cases arising out of controversies of this kind, that the combination of the strong association of members of the labor union, make that which would be entirely lawful on the part of the individual, unlawful on the part of the labor union.

This argument, it seems to me, can only be based on the ineffectiveness of such action on the part of an individual, and its effectiveness in the hands of a combination. In other words, the argument reduces itself to this: the action of an individual in persuading others to abstain from patronizing a given firm is lawful *because it is too weak and ineffective to have an appreciable result;* but, the action of a combination of workers is unlawful, because it is (or may be) strong enough *to be effective,* and accomplish its purpose.

I cannot see that there is very much of reason in such a doctrine. It seems to me, if it is perfectly lawful for an individual laborer to inaugurate a peaceful boycott against his employers, or for a number of individual laborers to engage in such a boycott, it cannot be made unlawful, because the members engaged are large enough, or the combination strong enough, to have some chance to make their boycott and persuasion effective and successful.

It would be idle and foolish—a cat and a mouse proposition—and make a plaything of the rights of laboring-men, to say that they may do a thing, for the purpose of winning better conditions for themselves, with perfect right and lawfulness *as long as they are too weak to win their cause,* or to effect their purpose, but, as soon as they are combined in such a way and with sufficient strength *to have a chance to win*—sufficient strength to be likely to cause the employer to yield, and give them the better conditions asked for—it immediately becomes unlawful. It seems to me entirely clear that if they have the right as individuals to institute a boycott against their employers and persuade others to quit his patronage, for the purpose of bringing a moral pressure to bear upon him, to give them better conditions and to recognize their union, or to consent to collective bargaining (which mean the same thing), then they have a right to resort to every peaceful influence that is within their power, and to every possible means which does not involve any act otherwise unlawful. I see no reason why they may not appeal to the public generally to take their side of the controversy and throw the weight of its patronage in their favor.

It would seem to follow that the general right of employees belonging to labor unions, to declare a peaceful boycott against their employer, and at proper times and places, appeal to their friends and persuade everyone they can, to assist them in such peaceful boycott, for the purpose of establishing, if they can, the principle of collective bargaining, and the recognition of their union for that purpose, is incontrovertible, and must, upon principle, be sustained.

This brings us to the second question, namely: is it lawful for such unions to exercise their general right,

at the places where they did in this instance—that is, on the sidewalk in front of the employer's place of business? Here, again, it is plain that this would be the most effective place, and therefore the most desirable, from their standpoint, for reaching and persuading persons who would otherwise be customers of their employers. In a large city one could not do much effective persuading in a matter of this kind, except in the vicinity of the employer's place of business—at least it would seem, by means financially and otherwise, within the power of an organization of laborers. In the very nature of things, if they could not go in the vicinity of their employer's place of business to exercise this persuasion, they might as well yield the controversy, for their efforts would be entirely useless, and the pressure they could bring to bear upon their employer would be so weak that he could snap his fingers at them with impunity.

The streets of the city are public highways. They do not belong to the owner of the adjoining property. He or his predecessor in interest had dedicated them to the public use. They belong to the public and are under the control of the public authorities. Subject to regulation by ordinance of the city council, or act of the state legislature, any member of the public may use them in a proper way and for all proper purposes.

It is true that the owner of the adjoining property is oftentimes and generally assessed for the improvement of the same. But this is not because he owns or controls the sidewalks or streets, but because the improvement is supposed to be an especial benefit to his property, which he really does own; and to make it more valuable.

He has a right, no doubt, to insist upon an open and unobstructed way from his building and place of busi-

ness, to the street and sidewalk, for himself, his employees, and his customers. His rights are just the same as the rights of a riparian proprietor of the land along a navigable river, or the proprietor of land lying along a county road. If anyone obstructs the right of ingress and egress so that he cannot get out or in to his place of business, or so that any of his customers cannot do so, such person would be committing a wrong, and if the wrongdoer insisted, he could no doubt maintain injunction.

But otherwise than this, he has no more right on the sidewalk than any other member of the public. He cannot jostle some other person away and take his place, and he must exercise his right to go upon the sidewalk and the street with just the same regard for the rights of other persons as any other member of the public would have to exercise.

As has been said, the city council and the state legislature have the authority to regulate the use of the street. They can no doubt confine the use to certain specific purposes. They can prevent loitering and can prevent any acts which cause large crowds to gather and unnecessarily obstruct the streets. Under their power to regulate the streets, they might perhaps have a right to make it unlawful for any person to use the streets or sidewalks for picketing, or to stand in one place or vicinity, for more than a given length of time, just as they can provide against the parking of automobiles in certain localities for more than a given period.

In this case it does not appear that there is any ordinance against picketing, or any ordinance against the use of the sidewalks for that purpose. Neither is there any act of the legislature making picketing unlawful. On the contrary, such legislation as there has

been seems to countenance and approve of the use of the public highways for such purposes.

In the absence of any legislation making it unlawful, I do not see why the members of a labor union do not have a right to go upon the sidewalk, near their employer's place of business, and there exercise their rights to peaceably persuade their friends or other persons not to patronize the firm in question, and in so doing, to use any quiet, orderly and peaceable means of such persuasion. Of course, if, while there, they engage in any disorderly conduct, they would be liable for a violation of the city ordinances in that regard; and if they indulge in intimidation of any kind, or violence or physical interference with the plaintiffs or their customers, another question would arise and the court would enjoin them from such action. But here, as we have seen, there is no serious claim that there was any violence or physical interference or disorderly conduct or threatening or intimidating words or actions.

It is sometimes urged that the very purpose of the picketing at such a place is, in effect, intimidation, and intended for that purpose; and upon this assumption is based the holding in some cases that there can be no such thing as peaceful picketing. But there seems to be no reason why the carrying of a banner by one or two young ladies in front of a place of business should be construed as in any way intimidating. It seems to me that, until the contrary is shown, we must assume that these young women were there for the purpose of persuasion, and not for the purpose of intimidation. If they were peaceful and orderly and quiet in their conduct, their banners and arguments would only appeal to those who sympathized with their cause and were friendly to it. It is true

that some persons might be kept from patronizing any particular firm that was being thus picketed, by reason of their desire to keep the goodwill of the labor organization, or their fear that by taking the other side of the controversy, they might make enemies of such organization. But that is an asset which properly and justly belongs to the labor people, just as the personal influence of the employer belongs to him.

It is sometimes urged that the employer has a right to run his business as he sees fit—to pay the wages that he sees fit—and to deal with his employees individually, rather than collectively, if he wishes so to do.

No doubt this is true—just as it is true with every business man in every way, that he can run his business just as he pleases, without regard to the wishes of those with whom he comes in contact—*if he is willing to pay the price.*

It is a question for any business man how far he can afford to yield to the wishes and whims and demands of his customers, or his employees. If the demands of his employees are unreasonable and unjust (as they no doubt often are) the employer may safely refuse them and reasonably expect that the public will ultimately support him, and that he will suffer, at most, no more than temporary loss; and he may, indeed, reap a just reward, by way of increased patronage and support, for his manly courage and independence.

If, on the other hand, their demands are reasonable, and his own position selfish and unfair, he may still stand upon his legal right to do with his own as he may see fit, and to run his business to suit himself. But he must then expect to pay the price, in loss of

goodwill and withdrawal of public support, and the resulting injury to his business.  The time has probably passed when any man or firm can run a great business, employing many men, *successfully,* and stand strictly upon his legal rights, to the extent of disregarding the welfare of his employees, their reasonable demands or even their just wishes.

The goodwill of a business depends much upon the way the particular business man is liked—upon his accommodating disposition—upon his fairness to the public and to his employees.  He cannot expect to hold this goodwill unless he oftentimes gives up his own wishes, and manages the business in such a way as to please and satisfy his employees, as well as other customers.  It is for him to say in all cases just how far he will do this in order to keep their goodwill, but if he does not do so and stands upon his rights in the matter, he can hardly complain because his employees quit their patronage and persuade others so to do.

It seems to follow—if the foregoing reasoning is accurate and logical—that the defendants had a right to go upon the sidewalk in the vicinity of plaintiffs' places of business, in such numbers as not to obstruct the access to their stores, and without interfering physically with the plaintiffs or their customers, and without creating any disturbance, or indulging in any disorderly conduct,—there exercise their right, in a peaceful and quiet way, to persuade their friends and sympathizers and any others whom they could thus influence, to withdraw their patronage from the plaintiffs, for the purpose of obtaining from the plaintiffs a recognition of their union, and inducing them to consent to collective bargaining with the union, on behalf of such employees.

This brings us to the consideration of Chapter 346 of the Laws of 1919, as to whether or not it gives any added assurance to the right of the defendants to indulge in a peaceful boycott of this character and for this purpose, and whether or not it expressly prohibits the issuing of the injunction asked for in this case.

Section 2 of the act seems to be only important in so far as it leads up to Section 3, immediately succeeding. It provides:

"No restraining order or injunction shall be granted by any court of this state * * in any case between an employer and employee or between employers and employees * * growing out of a dispute concerning terms or *conditions* of employment. * * "

Section 3, which is the important section, is as follows, in so far as it bears upon this case:

"No restraining order or injunction shall prohibit any person or persons, whether singly or in concert, * * from recommending, advising or persuading others by peaceful means so to do; or from attending *at any place* where any person or persons may lawfully be, for the purpose of peacefully * * persuading any such person to abstain from working; *or from ceasing to patronize any party to such disputes;* or from *recommending, advising, or persuading others* by peaceful or lawful means so to do * * or *shall any of the acts specified in this section be considered or held to be illegal or unlawful* in any court of the state."

It seems to me that the simple reading of this statute is sufficient to show, without further discussion, that it was the intention of the legislature to cover, and that the act does cover, disputes exactly like the one in controversy here.

It seems to me that to hold that this statute only applies in cases where the employees were still actually engaged in working for their employer, and that

it was not intended to be effective in cases where the relation of employer and employee are temporarily suspended by a strike, as in this case, would be altogether too narrow—so narrow as to be absolutely absurd. Such a construction would entirely defeat the obivous purpose of the statute. It is not to be supposed that employees who are still actually engaged in working for their employer would picket his establishment, or attempt to do so, or that their continued employment would be tolerated by the employer for a day or an hour, if they did. It is plain, therefore, upon principle, that the statute, in speaking of employer and employee, refers to the general relation, even though that relation has been suspended or even destroyed by a strike or lockout, and that it is not limited to cases where the employee is still engaged in active work.

It seems to me that the opinion of Mr. Justice JOHNS, in the companion case of *Greenfield* v. *Central Labor Council,* 192 Pac. 783, and in which it is held that the statute applies to a dispute between an employer and an employee, even when that relation is temporarily discontinued by a strike, is absolutely conclusive both upon reason and authority, and it is unnecessary here to go further than to refer generally to the cases of *Tri-City Cent. Trades Council* v. *Am. Steel Foundries* 238 Fed. 728 (151 C. C. A. 578); *Duplex Printing Press Co.* v. *Deering,* 252 Fed. 722 (164 C. C. A. 562); and *Iron Moulders' Union* v. *Allis-Chalmers Co.,* 166 Fed. 45 (91 C. C. A. 631, 20 L. R. A. (N. S.) 315), all of which are cited in, and fully support the reasoning of, the opinion of Mr. Justice JOHNS in that regard.

It seems to me equally impossible to reach the conclusion in this case that there was no dispute between the employers and the employees, or that the dispute was not in relation to labor conditions.

It is alleged in the complaint by the plaintiffs, and stipulated by both parties to be true, that "some of the members of said union [Jewelers Union No. 41] were, prior to the twenty-eighth day of July, 1919 [the date when picketing commenced], *employed as such by each of the plaintiffs."* The testimony of the plaintiffs themselves show that there was a dispute between these employees, who were members of the union, and their employers, the plaintiffs, and that a strike resulted.

Frank Heitkemper, one of the plaintiffs, testified:

"I didn't think our watchmakers would go out, to tell the truth. None of them were in a position to be idle, I didn't think. At 11 o'clock Monday morning they laid down their tools and walked out. I considered it a joke for awhile. After two or three days of this I realized I hadn't taken the thing up with them, except in an ordinary way, demonstrated my position to them, and I asked them to come in and talk it over. We met with five of the men. I discussed the matter with them."

Then, after testifying that there was no controversy over the hours of wages and no personal dislike,—

"Q. I said, 'What is the trouble?'

"A. 'Well, we belong to the Union. We can't work here until you sign this Union agreement.'"

So it seems entirely clear that there was a dispute between the employers and their employees. It is true that the employees were acting largely through the union, of which they were members. But this was in accordance with their aim and desire for col-

lective bargaining, under which they believed that their rights could be best conserved, and can make no difference. The essential conflict was between the employers and the employees.

It is impossible to distinguish in this regard between the rights of the employees, and the rights of the unions which represent them and of which they are members. The unions and their officers are the agents of the employees, chosen by the employees to represent them in the controversies with their employers. They occupy the position of any other agent. Their relation is much the same towards their members as that of an attorney towards his client. The client does not feel able by reason of temperament, or lack of education, to take care of his own interests, and he employs an attorney, who is supposed to have more experience and natural aptitude. The arrangement between the labor union and its members is similar. There is no reason why the officers of the labor union, when they are thus selected, and the matter is turned over to them by the employees, should not have the same rights as the employees themselves, and it would be foolish to attempt to treat them as strangers, or to say that they could be enjoined from exercising any right on behalf of the employees, which belonged to them. The sole and only purpose of a labor union is to strengthen the hands of the employees, who are its members and represent them in such disputes.

It also seems impossible to avoid the conclusion that the dispute in this case was under the terms of the statute, "A dispute concerning terms or conditions of employment."

The dispute was clearly over the question of collective bargaining, and the recognition of the right of the union to represent the employees of the different

99 Or.—4

plaintiffs who belong to their union, in making the contract under which the employees were to work, and also in the matter of adjusting any grievances or misunderstandings which might arise.

It seems it would be a narrow holding, indeed, that this right of collective bargaining, and to have their unions represent them in their contracts, and intervene to represent and protect them in the matter of any grievances or misunderstanding which might arise, did not affect the terms and conditions of their employment. The importance of this right to an employee who is a member of a union, cannot be overestimated. It is far greater than any mere temporary matter of wages, or hours of labor. If the employees must act as mere individuals, then as a rule they are not secure in their employment or in any right, or in the performance of any wage, or any limitation of their hours.

Laboring men, acting individually, are nearly always in an essentially weak position. As a rule, they have no large savings. Many of them are actually poor and have dependent families. They cannot well risk the loss of their employment. Some of them are ignorant, and hardly capable of driving any close bargains in their own behalf. They are hardly in a position to obtain the best terms, or to maintain and enforce a good contract when once obtained.

The employer, on the other hand, is generally well to do and is a trained business man. The loss of an individual employee means nothing to him. He can drive a hard close bargain with each individual employee and if by any chance some employee does secure a good contract, he can safely break it, as seems to have been done in the Greenfield case, and trust to the necessities of the men to keep on working even as

Frank Heitkemper naively admits he was doing in
this case, when he testified that he paid no attention
to the demands of his men at first, because he thought
that "none of them were in a position to be idle."

On the other hand, "In union there is strength,"
and if the employees can deal collectively, through
their union, they always have an agent, who is
capable and can contract as closely as their employer
in the first instance, and they always have the
strength of the union behind them if the contract is
broken.

Both the employers and the employees fully realize
the advantage which collective bargaining gives to the
latter, and this is no doubt the reason why the em-
ployers fight so hard against it on the one hand, and
the employees are so persistent in demanding it upon
the other. At any rate, it is an object which the
laboring people, who belong to labor unions, deem of
the utmost importance, and they have surely a right
to struggle for it, and to take any steps to achieve it,
which would be lawful to secure other beneficial ad-
vantages, and it surely affects the conditions of their
employment.

I can see no distinction between this case and the
Greenfield case. In both cases the employees were
animated by a lawful purpose to benefit themselves in
a lawful way, and in both cases the controversy was
over the terms and conditions of their employment.
If the statute applies in the one case, it clearly does
also in the other.

It will be noticed that the prohibition of any in-
junction, made by Section 3, is not limited to the em-
ployees only, but restrains the court from issuing an
injunction against "*any person* or persons, whether

singly or in concert," and the section winds up with
the potent declaration,—

"Or shall any of the acts specified in this section
be *considered or held to be illegal or unlawful* in any
court of the state."

It seems to me there can be no question but what
this law was intended to be, and was, addressed to
the action of labor unions, as well as their members,
and that it not only prohibited an injunction against
doing the things specified, but positively decreed that
they should not be held or construed by the courts
to be "illegal" or "unlawful." And among those
things declared lawful by the statute are clearly the
very things that the defendants were sought to be en-
joined from doing in this case.

There is one other question made in the brief of
respondent, and that is as to constitutionality of this
act. In this regard I concur entirely in the opinion
of Mr. Justice JOHNS in the companion case of *Green-
field* v. *Central Labor Council,* 192 Pac. 783, in
which it is held that the act is constitutional.
The opinion of Justice JOHNS in that case seems to
me so clear in its reasoning upon this point and so
supported by the authorities presented in that opin-
ion, that nothing further need be added.

It must be remembered, however, that at the time
the legislative act in question was passed the law in
the United States was in a state of great uncertainty,
as to the right of employees and their unions to en-
gage in peaceful picketing. It is probable that the
preponderance of authority even then rather favored
the rule that peaceful picketing was lawful, at least
when engaged in for the honest purpose of bettering
the condition of the employees. See authorities cited
by Mr. Justice JOHNS in the Greenfield case. But

even this was in doubt.   To show how great was the conflict, we have only to analyze the authorities cited in this case in the briefs of the respective parties. Of the eight cases from the courts of last resort, in the different states, cited by the plaintiffs, to sustain the proposition that peaceful picketing was unlawful, the decision was made in five by a divided court.   In *Velgahan* v. *Gunther,* 167 Mass. 92 (44 N. E. 1077, 57 Am. St. Rep. 443, 35 L. R. A. 722), five to two; in *Pierce* v. *Stablemen's Union,* 156 Cal. 70 (103 Pac. 324), four to three; in *St. Germain* v. *Bakery & Conf. W. Union,* 97 Wash. 282 (166 Pac. 665, L. R. A. 1917F, 824), six to one; *In re Langell,* 178 Mich. 305, five to three; in *Barnes & Co.* v. *Chicago Typ. Union,* 232 Ill. 424 (83 N. E. 940, 13 Ann. Cas. 54, 14 L. R. A. (N. S.) 1018), five to two.

It is only fair to say that there are a number of cases not cited in the briefs holding the same doctrine, but generally also by a divided court.

On the other hand, at the time of this legislation, the courts in the following cases had held directly to the contrary: *Sinsheimer* v. *United Garment Workers,* 77 Hun, 215 (28 N. Y. Supp. 321); *National Protective Assn. of Steamfitters and Helpers* v. *Cumming,* 170 N. Y. 315 (63 N. E. 369, 88 Am. St. Rep. 648, 58 L. R. A. 135); *Glass* v. *Glass,* 59 N. J. Eq. 49 (46 Atl. 208); *Union Pacific* v. *Ruef* (C. C.), (120 Fed. 124); *Standard Tube Co.* v. *Union,* 7 Ohio N. P. 87; *Everett* v. *Richmond,* 105 Va. 188 (53 S. E. 273, 8 Ann. Cas. 798, 5 L. R. A. (N. S.) 792); *Lindsay & Co.* v. *Montana Fed. of Labor,* 37 Mont. 264 (96 Pac. 127, 127 Am. St. Rep. 722, 18 L. R. A. (N. S.) 707); *Jones* v. *Van Winkle,* 131 Ga. 336 (62 S. E. 236, 127 Am. St. Rep. 235, 17 L. R. A. (N. S.) 848); *Karges* v. *Wood Workers,* 165 Ind. 421 (75 N. E. 877, 6 Ann. Cas. 829, 2 L. R. A. (N. S.) 788);

*State* v. *Van Pelt,* 136 N. C. 633 (49 S. E. 177, 1 Ann. Cas. 495, 68 L. R. A. 760); *Town of Neola* v. *Reich-art,* 131 Iowa, 492 (109 N. W. 5); *Truax* v. *Bisbee,* 19 Ariz. 379 (171 Pac. 125), and many other cases.

Most of these, also, had been decided by a divided court.

This court had recognized this state of uncertainty of the law in *Hall* v. *Johnson,* 87 Or. 21, 31 (169 Pac. 515, 518, Ann. Cas. 1918E, 49), in which Mr. Justice BENSON, delivering the opinion of the court, said:

"The question of peaceable picketing is one that has been discussed frequently and for many years past, by the courts. The judicial opinions have been conflicting, and it is difficult to determine accurately where the weight of authority falls."

In this state of uncertainty. as to the law it would seem very startling doctrine to me that the legislature had not a right to fix this uncertainty by legislation, and declare what the rule in this state should be, as to whether such picketing was lawful or unlawful.

As is said by Mr. Justice JOHNS in the Greenfield case, this law was by no means an experiment or a novelty, nor was this state a pioneer in such legislation.

In England in 1906 the following statute was enacted, contrary to the statutory law as it had previously existed there:

"It shall be lawful for one or more persons, acting in their own behalf, or on behalf of a trade union, or an individual employer, or firm, in contemplation of the furtherance of a trade dispute, to attend at or near a house or place where a person resides or works or carries on business, or happens to be, if they so attend merely for the purpose of peaceably obtaining or communicating information, *or of peace-*

*fully persuading any person to work or abstain from working"*: L. Rep. Stat. 1906, Edw. VII, Chap. 47, § 2.

And this statute, it is said by Mr. Martin in his work on the Modern Law of Labor Unions, at page 241, "might well be termed a codification of the law relating to peaceful picketing, as laid down by a majority of the American courts." That law had stood unchallenged by the courts of England for thirteen years at the time the Oregon legislation was enacted. It had been followed in this country in 1913 and 1914 by the Arizona statute, and by the federal statute, known as the Clayton Act, with both of which the act in question is substantially identical. The federal act has been uniformly sustained by the federal courts, as shown in the opinion of Mr. Justice JOHNS in the Greenfield case, and the Arizona act was also sustained by the Supreme Court of that state, against a direct attack upon its constitutionality.

Under these conditions we would be going a long way, and, as it seems to me, usurping the authority of the legislature, if we should undertake to hold this act unconstitutional.

It cannot be said, in view of the uncertain condition of the law before the passage of this act, that it even changed the law or the rights of the parties in any way. And if it had changed their rights, as regards each other, it would be no more than the legislatures are constantly doing, in thousands of instances, in relation to the rights, duties and liabilities of employers and employees, and in every other relation where the affairs of men bring their interests in conflict, and where, in the judgment of the legislature, good public policy and the just exercise of the police power requires a change.

As to the power of the court to issue an injunction in such cases, it follows of course that if the employees had the lawful right, either under or independent of the statute, to persuade their friends and sympathizers to withhold their custom from plaintiffs, in order to secure the principle of collective bargaining, and induce the employers to consent thereto; then the legislature would have an unquestioned right to prohibit an injunction against such lawful acts. And in any event and without regard to the rightfulness of the action of the employees, the matter of issuing an injunction is a matter of remedy —a matter of procedure which is unquestionably entirely within the control of the legislature.

In 15 C. J., Section 275, page 901, it is said:

"It is within the power of the legislature, subject to such provisions as may be incorporated in the Constitution, to establish the procedure by which courts shall exercise their jurisdiction, and, where a positive rule of practice is established by statute, the courts have no discretion in the matter."

The equitable powers of the court in this state are not derived from the Constitution. They are created and defined by act of the legislature: See Chap. 1, Title VI, p. 331, L. O. L. The power to issue injunctions and the limitation of such power and the conditions thereof are also creatures of statute: Chap. 4, Title VI, p. 348, L. O. L., et seq. What the legislature has given, the legislature can take away, or restrict and modify. The legislature in this state has always exercised the right to modify or restrict any power of the court which is not directly granted or limited by the Constitution. It cannot take away the right of trial by jury because that is protected by an explicit constitutional provision, but it can and has modified the equity practice—abolished bills of re-

vivor and bills of review, and made hundreds of other radical changes in the practice as it was both before and after the adoption of the Code.

We have no authority to set aside a solemn act of the legislature, either in the matter of defining the absolute rights of the parties, or in defining or restricting the procedure; simply because it may not accord with our ideas of natural justice.

In Lewis' Sutherland on Statutory Construction, page 137, it is said:

"An act cannot be annulled because, in the opinion of the court, it violates the best public policy, or does violence to some natural equity, or interferes with the inherent rights of freemen, nor upon the idea that it is opposed to some spirit of the Constitution not expressed in its words, nor because it is contrary to the genius of a free people. And hence the wisdom, policy, and desirability of such acts are matters addressed to the general assembly, and must rest upon the intelligence, patriotism, and wisdom of that body, and not upon the judgment of the court."

To epitomize this lengthy opinion, it seems to me that the defendants in this case had a right, in the absence of some legislative prohibition, to go upon the streets and into public places, even in the vicinity of plaintiffs' places of business, and there peaceably and quietly and in an orderly manner, without disturbing the peace, or doing any violent act, or indulging in any intimidation, persuade their friends and others with whom they might be able to reason, to abstain from patronizing the plaintiffs, in order to induce the plaintiffs to deal with them collectively and in a body, through their union.

If they should try to induce anyone having business relations with the plaintiffs to break their contracts with them, or if they picketed in such num-

bers as to interfere with ingress and egress to plaintiffs' places of business, or if they indulged in any intimidation or violence, another question would be presented.

When I speak of intimidation I mean unlawful intimidation. In Cooke on Monopoly and Labor Unions, page 7, it is said:

"In law a threat is a declaration of an intention or determination to injure another by the commission of some *unlawful* act, and an intimidation is the act of making one timid or fearful by such declaration. If the act intended to be done *is not unlawful,* then the declaration is not a threat in law, and the effect thereof is not intimidation in a legal sense."

In my judgment the decree of the court below should be modified so as to permit the defendants in a reasonable number to go wherever they may wish, upon the public streets, and there peaceably and quietly persuade, if they can, their friends and sympathizers to abstain from patronizing any firm who may be deemed to be unfair to labor, because it refuses to contract and deal with labor collectively and in a body.